IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-112-FL

| | |
|---|---|
| CHARLES A. CANNADY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings. (DE's-22 & 27). The time for filing any responses or replies has expired, and the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-22) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-27) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for Disability Insurance Benefits ("DIB") on September 21, 2005 alleging that he became unable to work on September 12, 2005. (Tr. 40). He later amended his disability onset date to April 14, 2005. *Id.* at 40, 115, 501. This application was denied initially and upon reconsideration. *Id.* at 40. A hearing was held before an Administrative Law Judge ("ALJ"),

1

who determined that Plaintiff was not disabled during the relevant time period in a decision dated May 21, 2008. *Id.* at 40-47. The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") granted Plaintiff's request for review on April 24, 2009, and the matter was remanded to the ALJ for further consideration. *Id.* at 87-88. The ALJ conducted a second hearing on February 3, 2010. *Id.* at 528-568. After the second hearing, the ALJ again determined that Plaintiff was not disabled in decision dated March 17, 2010. *Id.* at 7-22. On December 15, 2010, the Appeals Council denied Plaintiff's second request for review, rendering the ALJ's March 17, 2010 determination as Defendant's final decision. *Id.* at 3-6. Plaintiff filed the instant action on March 16, 2011. (DE-4).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...

42 U.S.C. § 405(g).

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
>
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity through his date last insured of December 31, 2009. (Tr. 12). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) bipolar disorder; 2) personality disorder; 3) obesity; 4)

3

hypertension; 5) heat intolerance; and 6) diabetes mellitus. *Id.* at 12. However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id* at 13. Based on the medical record, the ALJ determined that, through the date last insured, Plaintiff had the residual functional capacity ("RFC") to perform a limited range of medium work. *Id.* at 15.

The ALJ then determined that Plaintiff was unable to perform any of his past relevant work. *Id.* at 20. However, based upon the testimony of a vocational expert ("VE"), the ALJ determined that there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform. *Id.* at 20-21. Accordingly, the ALJ determined that Plaintiff was not under a disability at any time prior to December 31, 2009. *Id.* at 21-22. The undersigned has reviewed the entire record and finds that these determinations are supported by substantial evidence. However, Plaintiff's assignments of error relate entirely to the ALJ's alleged failure to properly assess Plaintiff's insomnia. (DE-23). Accordingly, the undersigned shall summarize the medical record with regard to that symptom.

Dr. Haresh Tharwani completed an employee medical certification form on August 11, 2003. *Id.* at 494. He opined that Plaintiff could perform the essential tasks of his position, but only with certain accommodations and/or restrictions. *Id*. at 495. When describing the nature and severity of Plaintiff's impairments, Dr. Tharwani notes that Plaintiff suffers from bipolar disorder *Id.* at 495. Insomnia is not specifically mentioned. *Id.*

Medical treatment records from Dr. Tharwani dated March 5, 2004 through September 29, 2005 consistently assess Plaintiff with bipolar I disorder and a personality disorder. *Id.* at 356-377. Generally, Plaintiff's: 1) mood was anxious; 2) attitude was cooperative; 3) affect was appropriate; and 4) speech was normal. *Id.* At times, his affect was depressed and reactive.

4

*Id.* at 360, 363. It was typically noted that Plaintiff was not experiencing any side effects from his medications. *Id.* at 356-377. His GAF during this time generally fluctuated between 51-60.[1] *Id.* Throughout this treatment period, Dr. Tharwani rarely specifically discusses Plaintiff's insomnia. *Id.* On January 12, 2004, it was noted that Plaintiff was "sleeping well at [night]." *Id.* at 471. Dr. Tharwani opined on March 5, 2004 that Plaintiff was "[t]aking his meds regularly" and doing "[a] little bit better." *Id.* at 376. Plaintiff denied depression and anxiety symptoms on July 12, 2004. *Id.* at 469. He also indicated that he "does not have any sleep problem." *Id.* On September 28, 2004, Plaintiff was "less anxious . . . less depressed . . . [and s]leeping some." *Id.* at 467. Plaintiff reported decreased sleep on October 28, 2004. *Id.* at 465. Plaintiff was anxious and pressured, although neurocognitive tests were negative for any neurological deficit. *Id.* On February 17, 2005, Plaintiff reported that he could not sleep at night. *Id.* at 374. It was noted on April 28, 2005 that Plaintiff was on medical leave because he had lost consciousness at work. *Id.* at 370. On May 17, 2005, Plaintiff stated that he had been examined by a neurologist and could return to work in two weeks. *Id.* at 368. Dr. Tharwani stated on June 21, 2005 that Plaintiff was continuing to experience "mood [symptoms]" and was frustrated with his work situation. *Id.* at 360. On July 12, 2005, Dr. Tharwani noted that Plaintiff had recently been hospitalized for depression. *Id.* at 364. During a July 21, 2005 examination, Plaintiff was "anxious and hypomanic." *Id.* at 366. Plaintiff reported feeling sad on August 18, 2005, and Dr. Tharwani noted that Plaintiff's wellbutrin was not working. *Id.* at 362. On September 22, 2005, Plaintiff was "not feeling too good." *Id.* at 358. He had been dismissed from his job

---

1 A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision 2000) ("DSM-IV-TR"), pg. 34.

because he "couldn't handle working out in the hot sun." *Id.* On September 29, 2005, Plaintiff was "stressed out because he was fired from work." *Id.* at 356.

Dr. Tharwani completed an employee medical certification form on June 6, 2004. *Id.* at 474. He opined that Plaintiff could perform the essential tasks of his position, but only with certain accommodations and/or restrictions. *Id.* When describing the nature and severity of Plaintiff's impairments, Dr. Tharwani notes that Plaintiff suffers from "depression, anxiety . . . [and] poor concentration." *Id.* at 475. Insomnia is not specifically mentioned. *Id.*

Intelligence tests conducted on September 21, 2004 placed Plaintiff in the low normal range. *Id.* at 477. It was suggested that Plaintiff be considered for medication review and possible more aggressive treatment of his depression and anxiety. *Id.* at 479. Finally, it was suggested that "[s]leep studies may also be helpful." *Id.* at 480.

On April 4, 2005, Dr. Gary Greenberg stated that Plaintiff was able "to work in strenuous activities, and in almost any setting, but not in unprotected proximity to high hazards." *Id.* at 422 (emphasis in original omitted).

A review of Plaintiff's symptoms on April 18, 2005 notes that Plaintiff has "difficulty sleeping." *Id.* at 419. His mental status was described as "normal." *Id.*

Dr. Timothy Collins stated on June 14, 2005, that Plaintiff could perform the essential tasks of his position, and that no restrictions or accommodations were needed. *Id.* at 416.

On August 31, 2005 it was noted that Plaintiff was diagnosed with bipolar disorder in 2003, and that Plaintiff has "always had issues with depression, anxiety and mania." *Id.* at 388. Plaintiff stated that his "bipolar affective disorder contributes to his employer's weariness." *Id.* He also noted that he had difficulty with memory and concentration. *Id.* A review of Plaintiff's systems noted that Plaintiff had "trouble sleeping." *Id.* at 389. The examining physician

contacted Dr. Tharwani by telephone. *Id.* at 390. Dr. Tharwani stated that "although . . . .[Plaintiff's] bipolar issue is severe and his moods cycle rapidly, his disease does not pose a safety threat to himself or others working around him." *Id.* at 391. He also opined that Plaintiff "may benefit . . . from a job with few psychological stressors." *Id.*

Dr. Marc Chimonas completed a employee medical certification form on September 2, 2005. *Id.* at 385. He opined that Plaintiff could perform the essential tasks of his position, but only with certain accommodations and restrictions. *Id.* Dr. Chimonas noted that Plaintiff had poor heat tolerance, but insomnia is not mentioned. *Id.* at 386.

Plaintiff's previous medical history was listed on September 4, 2005. *Id.* at 379-380. Insomnia is not mentioned. *Id.* During this examination, his speech was clear and he responded appropriately to questions. *Id.* at 380. His mood was anxious. *Id.*

A list of Plaintiff's medical problems compiled on November 28, 2005 did not include insomnia. *Id.* at 325.

Plaintiff's bipolar disorder was described as "controlled" on January 25, 2006. *Id.* at 315. A list of Plaintiff's medical problems did not include insomnia. *Id.* at 313.

On April 3, 2006, Plaintiff noted that "his bipolar has been controlled with . . . [medication] recently and he is pleased with the results." *Id.* at 307. When Plaintiff's medical problems were listed, insomnia was not mentioned. *Id.* at 306.

Dr. Walter Scarborough completed a Psychiatric Review Technique form on April 6, 2006. *Id.* at 328. He determined that Plaintiff's bipolar disorder, anxiety, and personality disorder did not precisely satisfy the diagnostic criteria of Listings 12.04, 12.06 and 12.08, respectively. *Id.* at 331-335. It was noted that Plaintiff had mild restrictions in his activities of daily living. *Id.* at 338. Plaintiff was assessed with moderate limitations in his ability to maintain social functioning

and maintain concentration, persistence or pace. *Id.* While assessing Plaintiff's mental RFC, Dr. Scarborough determined that Plaintiff was not significantly limited in 12 categories and moderately limited in every other rated category. *Id.* at 342. Ultimately it was determined that Plaintiff: 1) could concentrate on simple tasks; 2) was capable of interacting with others; and 3) could adapt to simple changes and function independently. *Id.* at 345. Plaintiff was deemed capable of performing simple, routine, repetitive tasks. *Id.*

Plaintiff was treated on December 22, 2007 for multiple complaints "including sore throat, boil in groin, [and] hypertension." *Id.* at 277. When examined, Plaintiff reported a decrease in sleep, racing thoughts and difficulty concentrating. *Id.* It was noted that Plaintiff was non-compliant with his medications. *Id.* He was not specifically diagnosed with insomnia after this examination. *Id.* Plaintiff was later evaluated for acute mania. *Id.* at 287. During his psychiatric examination, Plaintiff was depressed. *Id.* It was noted that that Plaintiff had "an erratic sleep schedule, sleeping only 3 hours every three days when he takes . . . [medication] to help him sleep." *Id.* Plaintiff stated that he spent "all of his time in bed watching television." *Id.* He was assessed with moderate bipolar I disorder and personality disorder. *Id.* Plaintiff's GAF was 50. [2] *Id.* at 289. He was not currently psychotic. *Id.* Plaintiff "adamantly refused" voluntary hospitalization. *Id.*

Dr. Tharwani examined Plaintiff on January 29, 2008. *Id.* at 259. Plaintiff continued to feel depressed and anxious. *Id.* Difficulty sleeping was not specifically mentioned, and Plaintiff was not specifically diagnosed with insomnia. *Id.* He was diagnosed with moderate bipolar I

---

2  A GAF between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR, pg. 34.

8

disorder and personality disorder. *Id.* at His GAF was 60. *Id.* Upon examination, Plaintiff had normal speech, anxious mood and constricted affect. *Id.* at 260.

On March 6, 2008, Dr. Tharwani drafted a letter stating that Plaintiff had been his patient since February 4, 2003. *Id.* at 258. He stated that Plaintiff suffered from: chronic bipolar I disorder, hypertension and diabetes mellitus. *Id.* Insomnia is not specifically mentioned. *Id.* Dr. Tharwani indicates that "[b]ecause of the nature of [Plaintiff's] diseases, he relapses and remits quite frequently." *Id.* In addition, Dr. Tharwani states that "because of multiple diseases [Plaintiff] cannot function well." *Id.* Finally, Dr. Tharwani notes that he hoped that Plaintiff "gets SSD so he can live a decent life." *Id.* This letter does not specifically identify Plaintiff's functional limitations. *Id.*

Plaintiff was examined by Dr. Tharwani on July 29, 2008. *Id.* at 249. He was "depressed and hopeless" and "having a hard time sleeping at night." *Id.* Plaintiff was diagnosed with, *inter alia*, moderate bipolar I disorder and personality disorder. *Id.* Insomnia is not listed as a specific diagnosis. *Id.* Upon examination, Plaintiff demonstrated average intelligence, fair insight and normal speech. *Id.* at 250. His thought process was logically directed. *Id.* Plaintiff's GAF was 65.[3] *Id.* at 249.

On August 8, 2008 Plaintiff was admitted to Dorothea Dix Hospital. *Id.* at 234. Plaintiff felt that he was "being persecuted in the neighborhood." *Id.* He was threatening violence, having paranoid thoughts, and contemplating suicide. *Id.* In addition, Plaintiff had not slept in three days. *Id.* Upon examination, Plaintiff had logical, goal directed and coherent thoughts. *Id.* at 236. However, his thought content was paranoid. *Id.* Ultimately, Plaintiff was diagnosed

---

[3] A GAF between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR pg. 34.

9

with, *inter alia*, a bipolar type I depressive episode or depression with psychotic features. *Id.* at 238. His GAF was 25.[4] *Id.* Plaintiff was treated with, *inter alia*, mood stabilizers as well as antipsychotic and antidepressant medication. *Id.* at 224. After treatment, Plaintiff was "euthymic and without evidence of psychosis." *Id.* It was noted that his behavior during treatment "remained stable." *Id.* at 225. He was discharged on August 27, 2008. *Id.* It was noted at that time that he was admitted for "manic agitation." *Id.* His GAF at discharge was 49. *Id.* Insomnia was not specifically mentioned in the discharge diagnoses, although it was noted that Plaintiff had "multiple somatic complaints." *Id.* at 226.

Plaintiff was "doing fairly well" on December 8, 2008. *Id*. at 215. He did report "some" insomnia. *Id*. However, Plaintiff was not specifically diagnosed with insomnia. *Id*. at 215-216. His GAF was 70. *Id.*

On February 8, 2009, Plaintiff self-presented to the Emergency Room at Dorothea Dix Hospital complaining of feeling out of control and having suicidal thoughts. *Id.* at 195-197. He was also afraid that he might hurt his mother and aunt. *Id*. Plaintiff stated that he "was getting out of hand." *Id*. at 197. His "main complaint [was] sleep." *Id*. A urine drug screen was positive for cannabis. *Id*. at 198. On February 16, 2009, Plaintiff reported feeling much better. *Id*. at 196. Plaintiff was assessed with "questionable personality profile and reason for [secondary] gain. *Id*. at 200. Plaintiff was diagnosed with, *inter alia*, bipolar disorder, although the examining physician noted the need to "[rule out] malingering." *Id*. at 201. Upon discharge on February 17, 2009, Plaintiff's GAF was 47. *Id*. at 195. The discharge diagnoses do not specifically mention insomnia, although it was noted that Plaintiff had recently experienced a

---

4 A GAF between 21 and 30 indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM-IV-TR, p. 34.

manic episode. *Id.* at 195.

Dr. Tharwani examined Plaintiff on March 30, 2009. *Id.* at 218. He noted that Plaintiff "stays [up] late at [night] and tries to sleep during the day." *Id.* However, when listing Plaintiff's "diagnosis and symptoms", Dr. Tharwani does not specifically mention insomnia. *Id.* Upon examination, Plaintiff demonstrated average intelligence, fair insight and normal speech. *Id.* His thought process was logically directed. *Id.* Plaintiff was diagnosed with, *inter alia*, moderate bipolar disorder and personality disorder. *Id.* His GAF was 70. *Id.*

On June 29, 2009, Plaintiff complained of insomnia. *Id.* at 221. Dr. Tharwani prescribed Klonopin and Rozerem. *Id.* at 223. Plaintiff stated that he stays home most of the day and week and that he does not get out much. *Id.* at 221. Plaintiff was diagnosed with moderate bipolar disorder and personality disorder. *Id.* His GAF was 70. *Id.*

Plaintiff testified that he stopped working in September, 2005 because of his bipolar disorder and heat intolerance. *Id.* at 508. He also stated that he had difficulty working during the day because he does not sleep well. *Id.* at 509. Taking his medications did not ensure him "a good night's sleep." *Id.* This lack of sleep made him argumentative and "unsteady at work." *Id.* at 510. He also has difficulty concentrating during the day. *Id.* at 514. When he tries to sleep, Plaintiff will "just lay there for hours and hours just thinking about things that [he] can't control . . . [a]nd in the morning, [he will] just feel totally wasted." *Id.* at 513. This inability to sleep occurs "two to three, maybe three to four nights a week." *Id.* at 514. Plaintiff testified that he will frequently go several days without sleeping. *Id.* at 515. He indicated that he is unable to do household chores. *Id.* at 516-517.

The VE testified that a person with Plaintiff's RFC could perform jobs which exist in significant numbers in the national economy. *Id.* at 522-526.

11

Based on this record, the ALJ made the following specific findings in addition to those previously noted:

> Over time, the claimant's medications have been titrated and changed to accommodate his active symptoms, but he continues to carry a diagnosis of bipolar disorder and is treated with multiple medications . . .
>
> [The record] tends to show that when the claimant follows prescribed treatment, he does not have greater than moderate limitations in any functional area as shown by the great majority of his GAF scores assessed during the relevant time period . . .
>
> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform a limited range of medium work . . . The claimant can only follow simple directions and accomplish simple tasks in the workplace. He is limited to occasional interaction with the general public and co-workers. He can tolerates stress such that he can adapt to simple changes and function[] . . . independently. He is restricted to simple, routine jobs that are on the lower end of the continuum for psychological stress. He is limited to occasional climbing of ladders, ropes, and scaffolds. He must avoid concentrated exposure to heat and humidity as well as a heat index about 85 degrees.
>
> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . .
>
> The claimant has carried a diagnosis of bipolar disorder type I since 2003 . . .
>
> The claimant testified that he continues to be [unable] . . . to work due to his combination of impairments. He reported continued difficulty with completing tasks and getting along with co workers which had led him to discontinue his past work. He reported continued symptoms of anxiety and problems with sleep despite being [compliant] with his medications. He reported having low energy and a dim view of the future. He testified that he continues to have heat intolerance because of his medications and that he spends a lot of time watching television. The claimant stated that he takes care of most of his personal affairs at night in order to avoid large crowds and that he is able to drive. He reported some side effects such as grogginess from his medications.
>
> After careful consideration of the evidence, the undersigned finds that the

claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

With respect to the claimant's allegations regarding his mental limitations, the undersigned does find that the claimant has rather extensive limitations as found above, but does not find the claimant's allegations that he is unable to sustain any work activity as a result to be persuasive. . . .

As far as side effects from the claimant's medications are concerned, it is not persuasive that they result in greater limitations than were assessed above. The claimant consistently denied any side effects for the most part in treatment sessions with Dr. Tharwani . . . [Claimant's] conditions appear to be satisfactorily controlled on his regimen of medications.

As for the opinion evidence, the undersigned has thoroughly considered the opinion of the claimant's treating psychiatrist, Dr. Haresh Tharwani, MD, and has adopted [many] of the specific functional limitations set forth by Dr. Tharwani. He drafted a supportive letter on behalf of the claimant dated February 2, 2010 and stated that the claimant has had difficulties with his mental limitations despite his compliance with medications and motivations to get help. No specific functional limitations were described . . .

The undersigned has found significant mental limitations based on the claimant's history of treatment and the opinion of Dr. Tharwani as a treating psychiatrist, but cannot fully rely on Dr. Tharwani's summary statements that the claimant has significant difficulties and should get "SSD." To the extent Dr. Tharwani's opinion is construed to mean that the claimant cannot perform any work activity on a regular and continuing basis due to his mental impairments, it is not fully persuasive because of the inconsistency with his own treatment notes. During the relevant time period, Dr. Tharwani routinely found the claimant to have only mild to moderate limitations in functioning based on GAF scores he assessed which generally ranged from 55 to 70. Although the claimant had temporary exacerbations of his mental impairments evidenced by his lower GAF scores during hospitalizations in August 2008 and February 2009, the treatment notes from Dr. Tharwani show that his condition improved immediately following these hospitalizations with treatment. Further, Dr. Tharwani's observation that the claimant cannot perform his past work is not inconsistent with the above residual functional capacity assessment because that work exceeds the limitations set forth in his residual functional capacity assessment. Finally, Dr. Tharwani has not assessed the claimant with

13

> specific functional limitations that are readily transferable to a residual functional capacity assessment. Significant weight has been given to this opinion, but the undersigned cannot adopt Dr. Tharwani's opinion that the claimant is entitled to social security benefits due to the weight of the evidence.
>
> *Id.* at 13-19.

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit.

Specifically, Plaintiff argues: 1) "the ALJ committed reversible error by failing to consider [Plaintiff's] insomnia in his assessment of [Plaintiff's] RFC, and by failing to mention [Plaintiff's] insomnia in the hypothetical question to the VE"; and 2) "the ALJ committed reversible error by failing to consider Dr. Tharwani's opinion that [Plaintiff's] insomnia renders him unable to function during the day." (DE-23, pg. 6, 9).

However, the ALJ did consider Plaintiff's insomnia (Tr. 18), and his assessment of Plaintiff's RFC was supported by substantial evidence. The ALJ is required only to "pose those [hypothetical questions] that are based on substantial evidence and accurately reflect the plaintiff's

14

limitations . . ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. March 13, 2000). Here, the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence and therefore accurately reflected all of Plaintiff's limitations. This argument is without merit.

Likewise, the ALJ properly evaluated Dr. Tharwani's opinion. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245, * 8 (W.D.Va. September 5, 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Id. (internal citations omitted). While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209, * 2 (4th Cir. 1999) (unpublished opinion)(internal

15

citations omitted). In his decision, the ALJ fully explained his reasoning in weighing the medical evidence. These reasons were supported by substantial evidence and, therefore, this argument is without merit.

**Conclusion**

For the aforementioned reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-22) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-27) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Tuesday, March 27, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE